## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

### ***

UNITED STATES OF AMERICA

               Plaintiff,

vs.

DAVID GRAY,

               Defendant.

2:11-cr-00143-JCM-VCF

REPORT AND RECOMMENDATION ON
MOTION TO SUPPRESS (#34)

### **REPORT & RECOMMENDATION**

Before the court is defendant David Gray's Motion to Suppress (#34). The government filed an Opposition (#38), and the defendant filed a Reply (#39). Sergeant Johnson, Officer Martin, and Parole and Probation Officer Pendleton testified at an evidentiary hearing held on March 8, 2012.

Defendant Gray is charged with possession of a firearm by a convicted felon. (#1). Defendant seeks an order suppressing all tangible and testimonial evidence seized during the stop conducted on or about December 1, 2010. (#34). Gray asserts that the officers who conducted the stop and subsequent search violated his Fourth Amendment rights because they lacked the requisite reasonable suspicion. *Id.*

### SUMMARY OF DECISION

The Government sustained its burden of proving by a preponderance of the evidence, taking into account the totality of the circumstances, that the officer directing defendant's stop had a reasonable suspicion, based on objective, particularized facts, that the defendant was a supervisee subject to a warrantless search. A brief, investigatory stop to confirm that the driver or passenger of the car was a supervisee would not have violated defendant Gray's Fourth Amendment rights.

The Government failed to prove by a preponderance of the evidence that the search of the car, conducted after the stop, was (1) based on a reasonable, particularized and objective basis for suspecting defendant of criminal activity, (2) based on the searching officer's actual prior knowledge of defendant's status as a supervisee, (3) properly narrowed in scope to fit the purpose of the investigatory stop, (4) consensual, or (5) justified for any other reason.

Accordingly, the Motion to Suppress should be GRANTED.

### FACTS

On December 1, 2010, defendant Gray, driving a silver Honda, pulled into the parking garage at the Parole and Probation Office (hereinafter "P&P") for a scheduled appointment with his probation officer[1].  (#34).  P&P is located in a building at 215 East Bonanza Road near a community pool and the fire department.  The Nevada Highway Patrol (hereinafter "NHP") has offices in the same building, and individuals parking in the parking garage in question can access both P&P and NHP offices through the same bank of elevators.

There are at least three signs indicating where P&P is located: (1) one sign on the outside of the building for P&P (#38 Exhibit B-1); (2) one sign that directs individuals where to park for P&P (#38 Exhibit B-3); and (3) one sign on the side of the building that points in the direction of P&P (#38 Exhibit B-2).  The signs do not indicate that the parking garage is only for P&P.  The only limitation indicated on the signs is that individuals can park in the garage for P&P "Mon thru Fri 7am to 5pm *only*."  (#38 Exhibits B-2 and B-3)(emphasis added).  No signs, either on the building, inside the garage, or at the garage entrance, give notice that cars are subject to a search.  Traffic must enter and exit through the same access driveway, which is two lanes wide.

---

[1]  On the date in question, defendant Gray was on probation for a 2008 conviction for robbery and conspiracy to commit robbery.  (#34).

P&P and NHP were conducting an operation on December 1, 2010, called "Operation Garage Clean-Up" (hereinafter "the Operation"). In preparation for the Operation, P&P had contacted NHP and asked for assistance with running license plates of vehicles that entered the parking garage and with searching the vehicles of probationers and parolees (hereinafter "supervisees") that were subject to a warrantless search condition[2]. Sgt. Johnson was the "point man" of the Operation, and he was stationed inside the entrance to the garage running the plates of vehicles as they entered the garage. Sgt. Johnson's car was parked on the inside of the right hand side of the garage. He was standing near his car hidden from the view of individuals entering the garage. On December 1, 2010, Sgt. Johnson ran approximately 200-250 license plates, and observed vehicles submitting to the searches. In Sgt. Johnson's opinion, a "majority" of the vehicles entering the garage were going to P&P. Individuals who were not going to P&P would park in the garage as well.

Around 4:00 p.m. on the day of the Operation, Sgt. Johnson observed a small silver four-door car with California license plates enter the garage. At that time, there was no line to get into the garage. Sgt. Johnson was on the passenger side of the car, and as the car passed, Sgt. Johnson began to run its license plate number. Sgt. Johnson did not recall whether he ever received information relating to the license plate. After the car passed the location where Sgt. Johnson was stationed, it made "an abrupt left turn," pulled into a parking spot, reversed out of the parking spot, and began driving towards Sgt. Johnson. This maneuver lasted approximately 20-25 seconds according to Sgt. Johnson. As Sgt. Johnson thought it was unusual for the car to U-turn or K-turn in this manner, Sgt. Johnson radioed to the other officers involved in the Operation to stop the car.

---

[2]   The warrantless search condition states that the supervisees are subject to a search, "with or without a search warrant or warrant of arrest," by the "Division of Parole and Probation or its agents." (#38-1). During the March 8, 2012, hearing, defendant's counsel suggested the absence of evidence that NHP was acting in an "agency" capacity on the day in question. The testimony demonstrated that P&P sought the assistance of NHP in executing the Operation. The court finds that there was an agency relationship between P&P and NHP during the Operation. NHP provided officers to act at the direction of P&P officers.

As a matter of course, Sgt. Johnson began scanning the individuals inside the car for safety purposes, and he observed the driver for a few moments as the car headed towards him.  Sgt. Johnson did not recognize the driver or know that the driver was a supervisee at that time.  To Sgt. Johnson, the driver looked "wide-eyed" and "shocked," and the passenger was looking back towards the officers at the end of the garage.  Officer Martin, of the drug task force for NHP, was also "on foot" assisting in the Operation by running plates and searching cars.  Officer Martin heard Sgt. Johnson shout for the car to stop, and stuck out his hand to stop the car.  Officer Martin had not noticed anything suspicious about the car, but stopped the car on Sgt. Johnson's request.  The car was not speeding towards the exit, and it was not difficult to stop the car.

After the car stopped, Officer Martin motioned for the car to park in a space nearby, and Sgt. Johnson began directing the traffic of incoming vehicles.  Officer Martin did not have any contact with defendant Gray.  Other officers involved in the Operation "made contact" with the occupants of the car and pulled defendant Gray from the car.  The officers who made contact with the occupants of the car did not testify at the hearing.

Defendant Gray's probation officer, Officer Pendleton, was not part of the Operation, but was contacted by an officer after defendant Gray was already in custody[3].  Officer Pendleton was called down to the garage to identify Gray as an individual on probation.  No evidence presented at the suppression hearing establishes when the officers conducting the search of the car Gray was driving became aware of his status as a supervisee or if they ever asked defendant Gray if he was a supervisee subject to a warrantless search.

Based on evidence discovered during a search of defendant Gray's car, on April 12, 2011, a Federal Grand Jury returned an indictment charging defendant Gray with one count of Possession of a

---

[3]  At the March 8, 2012, hearing, Officer Pendleton testified that during the operation, he was "conducting regular monthly reports inside the office."  When Officer Pendleton came down to the garage, he saw defendant Gray in handcuffs and identified defendant Gray as one of his supervisees.

Firearm by A Convicted Felon, in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2). (#1). On April 27, 2011, defendant Gray pleaded not guilty to the one count indictment, and the Federal Public Defenders Office was appointed to represent him. (#17). The court ordered defendant Gray detained and remanded to custody. *Id.* On December 30, 2011, defendant Gray filed the instant motion to suppress for Fourth Amendment violations, and requested an evidentiary hearing. (#34). This court scheduled an evidentiary hearing for February 27, 2012. (#40). On February 28, 2012, the court entered an order continuing the trial date until May 21, 2012. (#45). By stipulation and order, the evidentiary hearing was continued until March 8, 2012.

## DISCUSSION

In his motion to suppress, defendant Gray asserts that he was "unquestionably seized" when his car was stopped by Officer Martin, and that this seizure was "unconstitutional because the probation officers lacked any reasonable suspicion to justify the stop as required under the Fourth Amendment." (#34). Defendant Gray asks this court to suppress all statements and tangible evidence derived from the unlawful seizure and subsequent search of his person and car as "tainted fruit of the Fourth Amendment violation." *Id.*

**A.   Fourth Amendment**

The Fourth Amendment guarantees individuals the right "to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. Amend. IV. Fourth Amendment protections extend to "brief investigatory stops of persons or cars that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002); see also *Terry v. Ohio*, 392 U.S. 1, 9 (1968).

**1.   Seizure**

"[W]hen an officer, by means of physical force or some show of authority, has in some way restrained the liberty of a citizen," a seizure occurs within the meaning of the Fourth Amendment. *Terry*, 392 U.S. at 19. Here, the court finds that defendant Gray was seized when he complied with

NHP Officer Martin's order to stop the car.  *Id; United States v. Smith*, 633 F.3d 889, 893 (9th Cir. 2011)(holding that "[i]n the absence of physical force, in order to constitute a seizure, an officer's show of authority must be accompanied by "submission to the assertion of authority."").

### 2.    Reasonable Suspicion Based On Articulable Facts

The Fourth Amendment requires that a seizure be, at a minimum, "reasonable," and an investigatory stop of a car is reasonable "only upon a showing of reasonable suspicion: a particularized and objective basis for suspecting the particular person stopped of criminal activity."  *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975); *Arvizu*, 534 at 273; *United States v. Caseres*, 533 F.3d 1064, 1068 (9th Cir. 2008); see also *United States v. Sokolow*, 490 U.S. 1, 7 (1989).  In determining reasonable suspicion, the court looks at the "totality of the circumstances," and must find that the reasonable suspicion was based on more than an "inchoate and unparticularized suspicion or 'hunch.'"  *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (citing *Sokolow*, 490 U.S. at 7-8); see also *Terry,* 392 U.S. at 27; *Arvizu*, 534 U.S. at 273.

### a. Relevant Case Law

### i.  U-Turn Not Enough To Establish Reasonable Suspicion

In *United States v. Ogilvie*, the Ninth Circuit held that the acts of "turning off the highway and turning around" when approaching a checkpoint operated by border patrol agents are "not in themselves suspicious...."  527 F.2d 330, 332 (9th Cir.1975).  Defendant Oglivie was driving on the freeway near the Mexico/Arizona border, and border patrol agents were conducting a check point 14 miles north of the Mexican border.  *Id.* at 331.  Before reaching the checkpoint, defendant exited the freeway, made a left hand turn heading over the freeway overpass, and reentered the freeway going southbound.  *Id.*  An officer who observed the defendant exit the freeway and reenter it going the opposite direction, followed the defendant, pulled her over, and asked for her to open the trunk.  *Id.*

Defendant told the officer that she did not have keys to the trunk, and that she had turned around because she forgot her necklace at home. *Id.*  The officer smelled marijuana through an opening in the trunk, opened the trunk, and discovered 239 pounds of marijuana. *Id.* Defendant moved to suppress the marijuana, asserting that the stop was unlawful and in violation of the Fourth Amendment. *Id.*  On appeal, the Ninth Circuit held that the defendant's avoidance of the checkpoint was not enough to rise to the level of reasonable suspicion. *Id.* at 332.

The appellate court stated that "there is no evidence that Ogilvie drove fast, as if running away, disobeyed any traffic laws, or otherwise drove in an unusual or erratic manner. Ogilvie did what she had a legal right to do, reverse the direction of her travel, and did it in the only legal way that she could on that stretch of highway, an action that is not uncommon on a freeway." *Id.*  The court also stated that "[i]nnocent travelers often do the same for any number of reasons, including the unimaginative ones offered by Ogilvie, having nothing to do with illegal activity." *Id.*  The Ninth Circuit held that "the proximity of the turn to the checkpoint,...[is] not a sufficient foundation on which to rest reasonable suspicion." *Id.*

### ii. "Totality of the Circumstances"

The Ninth Circuit held in *Montero-Camargo*, that a U-turn combined with other factors may be enough to rise to the level of reasonable suspicion.  208 F.3d 1122.  In *Montero-Camargo*, the defendants were driving near the Mexican border, in tandem. *Id.* at 1126.  Once the cars passed a sign that indicated that the border check-point was active, the two cars made a U-turn on the highway. *Id.* at 1126.  Border Patrol Agents received a tip from another driver that two cars with Mexican license plates had made a U-turn on the freeway. *Id.*  Two agents drove in marked patrol cars towards the direction the two cars were driving, and the officers subsequently observed the cars pull over into an area that was known for illegal activity, such as dropping off drugs or picking up illegal aliens. *Id.* at 1127.  According to the agents, this location was primarily used by "lawbreakers" to evade inspection, because

it is in an area that is blocked from the view of the border patrol checkpoint.  *Id.*  The agents testified that "almost all of the stops made by the Border Patrol at the turnaround site resulted in the discovery of "a violation of some sort..." involving either illegal aliens or narcotics."  *Id.*

The agents noticed that the occupants of the cars were Hispanic, and observed a passenger in one of the cars glance in the mirror, notice the agents, and pick up a newspaper to read.  *Id.*  One agent testified that since his suspicions were raised at this point, he pulled over the car.  *Id.*   After stopping both of the cars, the agents searched the trunk of one of the cars and uncovered two large bags of marijuana.  *Id.* at 1128.  During a subsequent search, the agents found a loaded .32 caliber pistol in the glove box and an ammunition clip in the passenger's purse.  *Id.*

The defendants filed pre-trial motions to suppress on the ground that the car stop was not based on reasonable suspicion.  *Id.*  The District Court denied the motion, and one defendant entered a guilty plea, while the other went to trial and was found guilty.  *Id.*  On appeal, the panel majority agreed with the District Court, and set out a list of factors, without further explanation, that it considered.  *Id.*  A rehearing en banc was granted, and the En Banc Panel held that the agents had reasonable suspicion, but did so "on the basis of a more selective set of factors" than those relied upon by the District Court and the majority panel.  *Id.* at 1129.

The Ninth Circuit stated, that "[l]ike probable cause determinations, the reasonable suspicion analysis is "not 'readily, or even usefully, reduced to a neat set of legal rules'" and, also like probable cause, takes into account the totality of the circumstances."  *Id* (quoting *Sokolow*, 490 U.S. at 7–8 (quoting *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983))).  The court held that the finding of a particularized suspicion encompasses two elements: (1) an assessment of the totality of the circumstances, and (2) that assessment must arouse a reasonable suspicion that the particular person being stopped has committed or is about to commit a crime.  See *Terry*, 392 U.S. at 21 n. 18

("[t]his demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence").

In determining what factors to properly consider, the Ninth Circuit held that "sometimes conduct that may be entirely innocuous when viewed in isolation may properly be considered in arriving at a determination that reasonable suspicion exists." *Montero-Camargo*, 208 F.3d 1130. The Ninth Circuit stated that some factors on which the District Court and panel majority relied "are not relevant or appropriate to the reasonable suspicion analysis. *Id.* at 1131. Specifically, the court held that the previous courts erred in relying on the Hispanic appearance of the defendants as a factor in support of the reasonable suspicion, because a majority of the people who pass thru the border are Hispanic. *Id.* The court also found that the lower courts should not have relied on the fact that the passenger "appeared to quickly glance in the rear mirror before picking up a newspaper" as if to avoid eye contact with the agents. *Id.* at 1136. The court stated that "[t]he skepticism with which this factor is treated is in large part due to the fact that reliance upon "suspicious" looks can so easily devolve into a case of damned if you do, equally damned if you don't." *Id.* (citations omitted).

In finding reasonable suspicion existed, the Ninth Circuit stated that the U-turn "in this case constitutes a significant factor" only when combined with a number of circumstances. *Id.* at 1138. First, the court noted that making a U-turn on a highway "is very different from reversing direction by using a designated highway exit," as U-turning on the highway is unusual and often illegal. *Id.* Second, the court pointed out the fact that both cars made a U-turn on the highway and then immediately stopped "at the side of the highway in an isolated, deserted area frequently used to drop off or pick up undocumented aliens or contraband." *Id.* Third, the court found it important to note that the U-turn occurred right after the sign indicating that the upcoming check-point had been reopened. *Id.* Finally, the court held that "it is highly unlikely that the reason for the U-turn was that the cars had accidentally passed their exit point," because there is "only one turn-off anywhere in the area before the checkpoint,

and that turn-off leads to a private road rather than one that members of the general public might use." *Id.*

The court also stated that it relied on the *characteristic of the area* in which the cars stopped *as an independent factor*, as "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Id.* (citations omitted). The court noted that mere presence in a high crime area is not enough to support reasonable suspicion, and that the court must make sure that when the "high crime" characteristic of the area is considered as a factor, it is "limited to specific, circumscribed locations where particular crimes occur with unusual regularity." *Id.* at 1138. In this case, the court found that the "high crime" area was an appropriate factor, because the "area is in an isolated and unpopulated spot in the middle of the desert," and "the likelihood of an innocent explanation for the defendants' presence and actions is far less than if the stop took place in a residential or business area." *Id.* at 1139. In concluding its analysis, the Ninth Circuit stated that it gave some weight to both the Mexican license plates and the tandem driving, but that each factor did not "constitute substantial factors, either singly or collectively." *Id.* at 1139.

### iii. Unprovoked Flight

In *Illinois v. Wardlow*, the Supreme Court addressed whether flight in a "high crime" area upon noticing officers raised suspicions to justify a stop and subsequent *Terry* pat-down. 528 U.S. 119 (2000). On the day in question, four police cars were canvassing a neighborhood which was known as a high drug trafficking area, in order to investigate drug transactions. *Id.* at 121. The defendant was standing on the street holding an opaque bag when the caravan of police cars drove past him. *Id.* at 121-122. Upon seeing the police, the defendant fled in the opposite direction. *Id.* at 122. Two of the officers noticed defendant flee, followed him, and eventually cornered him on the street. *Id.* One of the officers got out of his car and conducted a pat-down for safety purposes. *Id.* The officer squeezed the

bag, and noticed that it contained an object in the shape of a gun.  *Id.*  The officer opened the bag and discovered a .38 caliber handgun with five rounds of ammunition.  *Id.*  The officers arrested the defendant.  *Id.*

Defendant filed a motion to suppress, and the trial court denied his motion.  *Id.*  After being convicted of unlawful use of a weapon by a felon, defendant appealed, and the Illinois Appellate Court reversed his conviction.  *Id.*  The Illinois Supreme Court upheld the Appellate Court's ruling, and held that the sudden flight in a high crime area does not create reasonable suspicion justifying a *Terry* stop. *Id.*  The court found that the flight may be an individual simply exercising his right to "go on one's way."  *Id.* at 123.  The United States Supreme Court disagreed, and held that "[f]light, by its very nature, is not "going about one's business.""  *Id.*

The court stated that "the officers anticipated encountering a large number of people in the area, including drug customers and individuals serving as lookouts," and that "[i]t was in this context that [the officer] decided to investigate [the defendant] after observing him flee."  *Id.*  The court held that the defendant's mere presence in this area did not justify the stop, but that "his unprovoked flight upon noticing the police" aroused the officer's suspicion[4].  *Id.*  In holding this, the court stated that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion," and "[h]eadlong flight— wherever it occurs—is the consummate act of evasion."  *Id.*  As discussed more thoroughly in the section below, the court recognized that since there could be innocent reasons for flight, *Terry* held that officers could detain individuals to resolve any ambiguity."  *Id.* at 125.  "In allowing such detentions," the court stated, "*Terry* accepts the risk that officers may stop innocent people," and simply allows "the officer to briefly investigate further."  *Id.* at 126.  "If the officer does not learn facts rising to the level of probable cause, the individual must be allowed to go on his way."  *Id.*

---

[4]  The court finds that there was no "unprovoked flight" when defendant Gray U-turned or K-turned in the P&P garage.  The car was not speeding or driving erratically, and defendant Gray complied once Officer Martin motioned him to stop the car. The manner in which defendant Gray operated the car, however, can be considered in the "totality of the circumstances," to determine whether a *Terry* stop was justified.

### 3.      Scope Of A Subsequent Search

Once a court finds that an "officer's action was justified at its inception" and that reasonable suspicion existed, the court must make an inquiry into the scope of the subsequent search.  *Terry,* 392 U.S. at 20.  The scope of a search "must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." *Id.* at 19 (quoting *Warden v. Hayden*, 387 U.S. 294, 310 (1967)).

### a. Relevant Cases - Search Must Be Reasonably Related In Scope To The Justification For The Stop

In *Terry*, the officer had a reasonable suspicion that two men were planning an armed robbery, when the men were "hover[ing] about a street corner for an extended period of time" and "pac[ing] alternatively along an identical route, pausing to stare at the same store window."  *Id.* at 23.  Though each of these acts separately would seem innocent, the court held that, when taken together, the series of acts "warranted further investigation."  *Id.* at 22.  The court explored whether there "was justification for [the officer's] invasion of Terry's personal security by searching him for weapons in the course of that investigation."  *Id.* at 23.  The court found that a "reasonably prudent man would have been warranted in believing [the two men were] armed" and that a threat existed.  *Id.* at 28.  "The sole justification for the search in [*Terry* was] the protection of the police officer and others nearby, and [the search] must therefore [have been] confined to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer."  *Id.* at 29.

After the officer approached the men, he patted down their outer clothing.  *Id.* at 29.  Once the officer felt weapons, he "merely reached for and removed the guns."  *Id.* at 30.  As the officer did not feel any weapons on the third man that later joined the two men, the officer did not go beyond the initial pat-down.  *Id.*  The court held that the investigatory search in *Terry* was not in violation of the defendants' Fourth Amendment rights, because it was "confined...to what was minimally necessary to learn whether the men were armed and to disarm them once [the officer] discovered the weapons."  *Id.*

The court concluded that an officer must "carefully restrict his search to what [is] appropriate," and that an officer cannot conduct a "general exploratory search for whatever evidence of criminal activity he might find." *Id.*

In a subsequent United States Supreme Court case, the court held that "[a] brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information," may be most reasonable in light of the facts known to the officer at the time. *Brignoni-Ponce*, 422 U.S. at 881. In *Brignoni-Ponce*, the officers were parked on the side of the highway observing traffic near a closed border check-point and were using their headlights to illuminate passing cars. *Id.* at 875. Based solely on an observation that occupants in a passing car were of Mexican descent, the officers pursued the car and stopped it. *Id.* The officers questioned the occupants regarding their citizenship, and learned that the passengers were aliens who had entered the country illegally. *Id.* The passengers and the driver were arrested, and the driver was charged with knowingly transporting illegal immigrants. *Id.*

The driver filed a motion to suppress, claiming that the evidence of the two passengers should be suppressed as fruit of the illegal seizure. *Id.* The court denied the motion, and the driver was convicted. *Id.* On appeal, the Ninth Circuit held that the Fourth Amendment forbids stopping a car, even for the limited purpose of questioning its occupants, unless the officers have a 'founded suspicion' that the occupants are illegal aliens. *Id.* at 876. The fact, alone, that the occupants appeared to be of Mexican descent was not enough to support a founded suspicion, and the court held that the motion to suppress should have been granted. *Id.*

The Supreme Court granted certiorari, and upheld the decision of the Ninth Circuit. *Id.* The court stated that the Fourth Amendment "forbids stopping or detaining persons for questioning about their citizenship on less than a reasonable suspicion that they may be aliens." *Id.* at 884. The court held that, as in *Terry*, if reasonable suspicion had existed based on the assessment of the facts in light of the

officer's experience, the officers would have been entitled to "stop the car briefly and investigate the circumstances that provoked suspicion." *Id.* at 881.  As the suspicion would be that the occupants were illegal aliens, the officers "may question the driver and passengers about their citizenship and immigration status," and "may ask them to explain suspicious circumstances." *Id.* at 881-882.  The court held that, beyond those inquiries, "any further detention or search must be based on consent or probable cause." *Id.* at 882.  The search and intrusion into the occupants' privacy must be reasonably related in scope to the justification for the stop. *Id.* at 881; See also *Terry*, 392 U.S. at 29.

### 4.    No Reasonable Suspicion Necessary - Status As Supervisee

The Fourth Amendment "does not prohibit a police officer from conducting a suspicionless search" of a supervisee who is subject to a warrantless search condition. *Samson v. California*, 547 U.S. 843, 857 (2006).  The Supreme Court has held that "[w]hen an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." *Id.* at 850 (quoting *United States v. Knights*, 534 U.S. 112, 121 (2001).  An officer, however, must have knowledge of the individual's status as a supervisee prior to the seizure in order to ensure that a Fourth Amendment violation does not occur. *Moreno v. Baca*, 431 F.3d 633 (9th Cir. 2005).

### a. Relevant Case Law - Officer's Knowledge Of Status As A Supervisee

In *Moreno*, the Ninth Circuit held that an officer must have prior knowledge that the individual is a supervisee, and that "police officers cannot retroactively justify a suspicionless search...on the basis of an after-the-fact discovery of an arrest warrant or a parole condition." *Id.* at 641.  The defendant in *Moreno* was walking down the street with another individual, when two officers drove past them, turned around, and stopped in their pathway. *Id.* at 636.  The officers got out of the patrol car, patted the men down, and ordered them to place their belongings on the hood of the patrol car. *Id.*  The officers placed

the men in the backseat of the patrol car and one of the officers began running the men's names for warrants.  *Id.*  The two men were asked if they were on parole or probation, and defendant Moreno stated that he was a parolee.  *Id.*  A search of the men's names revealed that defendant Moreno also had an outstanding arrest warrant.  *Id.*

The officers testified that defendant Moreno looked "startled" when he saw the patrol car approach, and that they observed defendant reach in his pocket and discard an object as the officers turned the car around.  *Id.*  After the men were in the patrol car and the officer began running their names, the other officer went to the location where the object was allegedly discarded, and found rock cocaine.  *Id.*  The officers let the other individual go, but arrested Moreno both for being in possession of rock cocaine and under the authority of the warrant.  *Id.*  The officers testified that "they were aware from their training and experience that a standard term of parole was that parolees were subject to warrantless searches by any peace officer."  *Id.* at 637.

Defendant Moreno was acquitted of the criminal charges against him, but filed an action under 42 U.S.C. § 1983 contending that the officers violated his Fourth Amendment right to be free from unreasonable searches and seizures.  *Id.*  It was undisputed that the officers "learned that Moreno was on parole and that he had an outstanding arrest warrant only after searching and detaining him."  *Id.*  The officers argued that Moreno had no right to be free from suspicionless arrests and searches because of the outstanding bench warrant and the parole condition.  *Id.*  The officers filed a motion for summary judgment based on qualified immunity, which the court denied.  *Id.*

The District Court found that reasonable suspicion was necessary, and held that the facts and circumstances of the incident "do not come close to the level of suspicion that existed" in cases where the court previously found reasonable suspicion.  *Id.*  The court also held that with regard to the defendant's "startled" look, "a suspect's nervousness at the sight of law enforcement, by itself, did not give rise to reasonable suspicion.  *Id.*  The officers' argument that the search was justified because of

15

defendant's outstanding warrant and parole search condition was rejected by the District Court as well. *Id.* The officers appealed the District Court's ruling, and the Ninth Circuit affirmed. *Id.*

The Ninth Circuit stated that "facts and circumstances within the officer's knowledge [must be] sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense." *Id.* at 639 (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979)). The court must first undertake an "objective assessment of an officer's actions in light of the facts and circumstances *then known to him*." *Id.* (quoting *Scott v. United States*, 436 U.S. 128, 137, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978)(emphasis added)).

The court found that since the officers did not know of the defendant's status as a parolee or that he was subject to an outstanding arrest warrant at the time they stopped, searched, and arrested him, reasonable suspicion was required. *Id.* In conclusion, the court held that "an officer must know of a detainee's parole status before that person can be detained and searched pursuant to a parole condition." *Id.*

**B.      The Stop Did Not Violate Defendant Gray's Fourth Amendment Rights**

**1.      Justification for the Stop**

As there is no evidence that Sgt. Johnson or Officer Martin had knowledge of defendant Gray's status as a supervisee prior to stopping him, the stop of defendant Gray was not conducted pursuant to the warrantless search condition, and reasonable suspicion must be established. *Moreno*, at 639–40 (holding that the court must make an "objective assessment of an officer's actions in light of the facts and circumstances *then known to him*," and that "an officer must know of a detainee's parole status *before* that person can be detained and searched pursuant to a parole condition.")(emphasis added). Since the U-turn in itself is not enough to establish reasonable suspicion, the court must consider the "totality of the circumstances." See *Ogilvie,* 527 F.2d at 332; *Montero-Camargo*, 208 F.3d at 1129.

The court finds that Sgt. Johnson's testimony supports a determination that a founded, reasonable suspicion existed to stop the car, i.e. "a particularized and objective basis for suspecting" defendant Gray was a supervisee subject to a warrantless search condition.  See *Brignoni-Ponce*, 422 U.S. at 878; *Arvizu*, 534 at 273; *Caseres*, 533 F.3d at 1068; see also *Sokolow*, 490 U.S. at 7–8.

During the hearing, Sgt. Johnson testified that he radioed the officers to stop the car defendant Gray was driving for the following reasons: (1) defendant Gray's car was driving normally when it entered the garage, but it made an "abrupt left turn" when it approached the officers searching the cars, and U-turned or K-turned back towards the exit; (2) this was the only car throughout the Operation that acted in this manner; and (3) although defendant Gray was not speeding towards the exit or driving the car erratically, he looked "wide-eyed" and "shocked," and the passenger was looking back at the officer. Although these reasons taken individually may seem innocent and would not rise to the level of reasonable suspicion, when taken together, they are properly considered in making a determination of reasonable suspicion.  See *Montero-Camargo*, 208 F.3d at 1130; See also *Wardlow*, 528 U.S. at 119 (holding that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion..."). This is especially true when viewed in the context of the characteristics of the area involved – P&P parking garage.  *Montero-Camargo*, 208 F.3d at 1138 (stating that "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation.").

On the day in question, the officers were conducting the Operation in a parking garage used by supervisees, as well as other individuals.  A majority of the vehicles entering the garage contained supervisees.  The object of the Operation was to search supervisees pursuant to a warrantless search clause, and the officers, including Sgt. Johnson, anticipated coming in contact with individuals subject to such a clause.  The Operation came about because P&P had encountered several supervisees with contraband at P&P.  Sgt. Johnson observed 200-250 vehicles enter the parking garage, and defendant

Gray's car was the only one to abruptly turn left and attempt to exit the garage.  It was in this context, that Sgt. Johnson made the decision to stop the car.  See *Wardlow*, at 124 (holding that the officers "anticipated a large number of people in the area, including drug customers and individuals serving as lookouts," and that it was in this context that the officers decided to stop the defendant when he fled.).

Based on the "totality of the circumstances" discussed above, including Sgt. Johnson's three particularized reasons for suspecting that defendant Gray was a supervisee subject to a warrantless search clause, the court finds that reasonable suspicion existed to stop the car defendant Gray was driving for the purpose of determining whether the driver or passenger was a supervisee.  *Montero-Camargo*, 208 F.3d at 1130 (holding that "sometimes conduct that may be entirely innocuous when viewed in isolation may properly be considered in arriving at a determination that reasonable suspicion exists."); *Sokolow*, 490 U.S. at 7-8; see also *Terry*, 392 U.S. at 27; *Arvizu*, 534 U.S. at 273; *Wardlow*, 528 U.S. at 127.

Since Sgt. Johnson had a reasonable suspicion that defendant Gray was a supervisee, under *Terry*, the officers could stop defendant Gray and resolve the ambiguity surrounding his status as such. See *Wardlow*, 528 U.S. at 126 (stating that "*Terry* held that officers could detain individuals to resolve any ambiguity," and simply allows "the officer to briefly investigate further," and "[i]f the officer does not learn facts rising to the level of probable cause, the individual must be allowed to go on his way."). The stop of defendant Gray's car did not violate defendant Gray's Fourth Amendment rights.

**B.    The Search of the Car Defendant Gray was Driving Did Violate Defendant's Fourth Amendment Rights.**

**1.    Subsequent Investigatory Search Of The Car**

Since the court finds that Sgt. Johnson had a reasonable suspicion that defendant Gray was a supervisee, the court must determine if the subsequent "investigatory search" was sufficiently narrowed in scope. *Terry*, 392 U.S. at 19 (holding that the scope of a search "must be 'strictly tied to and justified

by' the circumstances which rendered its initiation permissible.")(quoting *Warden*, 387 U.S. at 310); See also *Brignoni-Ponce*, 422 U.S. 881 (holding that the search and intrusion into the defendant's privacy must be reasonably related in scope to the justification for the stop.).

The court finds the instant situation analogous with the situation discussed in *Brignoni-Ponce*. The court in *Brignoni-Ponce* stated that if reasonable suspicion existed that the occupants of a car were illegal aliens, the officers could conduct a stop and inquire as to the citizenship and immigration status of the occupants. *Brignoni-Ponce*, 422 U.S. at 881-882. Since the only justification for the stop was the suspicion that the occupants were illegal aliens, the scope of the stop must be related to that suspicion. *Id.* at 881. Here, Sgt. Johnson had a reasonable suspicion that defendant Gray was a supervisee. Sgt. Johnson did not have a suspicion that defendant Gray was committing some generalized crime, rather he had a particularized suspicion that defendant Gray was a supervisee attempting to avoid a search. Thus, the scope of the subsequent investigation was limited to and must have been reasonably related to that suspicion. *Id*; See also *Terry*, 392 U.S. at 20 (holding that a search must be "reasonably related in scope to the circumstances which justified the interference in the first place."). After the initial stop of defendant Gray's car, which was supported by reasonable suspicion, the officers were entitled to inquire as to defendant Gray's status as a supervisee. See *Brignoni-Ponce*, 422 U.S. at 881-882. The officers were also entitled to "maintain the status quo momentarily" while checking the identity and status of the driver and passenger. *Id.* Any search or detention beyond that inquiry "must [have been] based on consent or probable cause." *Id.*

### a.  Burden Of Proof

In an evidentiary hearing on a motion to suppress evidence due to a Fourth Amendment violation, the Government bears the burden of justifying a warrantless search. *United States v. Johnson*, 936 F.2d 1082, 1084 (9th Cir. 1991). Here, the Government bore the burden of establishing by a preponderance of the evidence that (1) reasonable suspicion existed to stop the car and (2) the

subsequent search was related to defendant's status as a supervisee and limited accordingly[5].  See *Terry*, 392 U.S. at 20; *Brignoni-Ponce,* 422 U.S. at 881-882.  The court notes that if the officers had verified defendant's status as a supervisee, the officers would not have needed any further reasonable suspicion or probable cause to search the car, and the scope of the search would not have been limited by the purpose of the *Terry* stop.  See *Samson*, 547 U.S. at 857 (holding that the Fourth Amendment "does not prohibit a police officer from conducting a suspicionless search" of a supervisee who is subject to a warrantless search condition if the officer knows of the individuals status as such).

### b.   Testimony/Evidence Related To The Scope Of The Search

Here, since there was no evidence of consent or actual prior knowledge of defendant's supervisee status, or a showing of probable cause to justify the subsequent search, the court must examine the scope of the search.  *Brignoni-Ponce*, 422 U.S. at 881-882.  During the hearing, the court was not presented with any evidence relating to the scope of the search.  The court cannot determine whether the officers properly inquired as to defendant's status as a supervisee, or whether the scope of the search was "strictly tied to" Sgt. Johnson's suspicion that defendant was a supervisee.  See *Terry*, 392 U.S. at 18.  Other than Officer Pendleton's testimony that he first identified defendant Gray as a probationer after he was in custody, no evidence presented at the suppression hearing established when the officers first learned of defendant Gray's status as a supervisee.  There was no evidence that the officers inquired regarding defendant's status prior to Officer Pendleton's arrival on the scene.  No evidence established when the search of the Honda occurred in relation to the searching officers learning of defendant Gray's status as a supervisee.  Thus, as the court has no grounds to conclude that the search was "reasonably related in scope to the justification for [the] initiation," i.e. suspicion that defendant Gray was a supervisee, the government has not met its burden of justifying the warrantless search of the

---

[5]  Alternatively, the government had the burden of demonstrating that a general search was otherwise appropriate, e.g. the defendant consented to the search; a reasonable, particularized, and objective basis for suspecting defendant of criminal activity existed; or the searching officers had prior actual knowledge of defendant's status as a supervisee.

car defendant Gray was driving.  See *Johnson*, 936 F.2d at 1084; *Brignoni-Ponce*, 422 U.S. at 881-882; *Terry,* 392 U.S. at 29.  Similarly, no evidence presented at the hearing justifies the search on any other grounds.

**C.     Exclusionary Rule**

If the court determines that a seizure is unreasonable and in violation of the Fourth Amendment, any evidence obtained as a result of the seizure may not constitute proof against the victim of the violation.  *Wong Sun v. United States*, 371 U.S. 471, 484 (1963).  "[E]vidence may not be introduced if it was discovered by means of a seizure and search which were not reasonably related in scope to the justification for their initiation."  *Terry*, 392 U.S. at 29 (citing *Warden*, 387 U.S. at 310).   As the court has not been presented with evidence to support a finding that the warrantless search was justified under the Fourth Amendment, the evidence discovered by means of the search may not be introduced.  *Id.*

**RECOMMENDATION**

Based on the foregoing, it is the recommendation of the undersigned United States Magistrate Judge that Defendant Gray's Motion To Suppress (#34) should be GRANTED.

DATED this 27th day of March, 2012.

_____
CAM FERENBACH
UNITED STATES MAGISTRATE JUDGE